IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**1 FITZWATER STREET, LLC**
4515 Willard Ave, Ste 1604
Chevy Chase, MD 20815

    *Plaintiff*,

v.

**RANDOLPH J. TAYLOR**
406 Camden Avenue
Salisbury, MD 21801
Wicomico County

**CITY OF SALISBURY**
115 S Division St
Salisbury, MD 21801
Wicomico County

    *Defendants*.

Civil Action No.: _____

## COMPLAINT

Plaintiff 1 Fitzwater Street, LLC ("**Developer**"), by its undersigned counsel, hereby sues Defendants Randolph J. Tayor, the mayor of the City of Salisbury ("**Mayor Taylor**") and the City of Salisbury (the "**City**" and collectively with Mayor Taylor, "**Defendants**"), alleging as follows:

## PARTIES

1. Plaintiff 1 Fitzwater Street, LLC is a Delaware limited liability company and the owner of commercial real property located at or about 1 Fitzwater Street, Salisbury, MD 21801, commonly known as Marina Landing. Plaintiffs' members are domiciled in Florida and New York.

2. Defendant Randolph J. Tayor, LLC is a natural person domiciled in Salisbury, Maryland and is the mayor of the City of Salisbury.

3. Defendant the City of Salisbury is a municipal corporation established under the Charter of the City of Salisbury and governed by its mayor and city council pursuant to its Charter.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over Developer's federal claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1343 and has supplemental jurisdiction over Developer's state law claims pursuant to 28 U.S.C. § 1367.

5. This Court has personal jurisdiction over Mayor Taylor because he is a resident and citizen of the State of Maryland.

6. This Court has personal jurisdiction over the City because the City's territorial boundaries are within the State of Maryland.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside in this District, a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District, and the real property that is the subject of this action is situated in this District.

## FACTUAL ALLEGATIONS

### BACKGROUND

8. In 2016, Developer's affiliate, Salisbury Development Group, LLC, and the City entered into a Land Disposition Agreement whereby the City agreed to convey or lease certain real property located at or about 1 Fitzwater Street, Salisbury, MD 21801 (the "**Property**") for development and construction. Thereafter, Developer's affiliate performed substantial work and expended significant funds for purposes of the development and construction at the Property. In connection therewith, in 2017, Developer's affiliate entered into a deed of gift of certain real property to the City.

9.      In early 2022, Developer's affiliate and the City entered into an Amended and Restated Land Disposition Agreement for the Property (the "**LDA**").  A copy of the LDA is attached hereto as **Exhibit 1** and incorporated herein by reference.  In pertinent part, the recitals of the LDA recognize that the "express purpose" of the LDA was as follows:

> the City desires to sell to Developer and Developer desires to Purchase from the City [the Property] for the express purpose of Developer's development and construction of: **(i)** two (2) five (5) story or more tall mixed-use buildings containing not less than twenty-eight (28) apartment units (each such building is hereinafter referred to as a/the "**Marina Landing Towers**" and collectively the "**Marina Landing Towers**"); **(ii)** one (1) five (5) story or more mixed-use building. consisting of **(A)** first (1st) floor commercial floorspace developed for the operation thereon of a boathouse business and any other use reasonably related thereto, and **(B)** the second (2nd) through fifth (5th) floors containing not less that twenty (20) apartment units (said five (5) story building is hereinafter referred to as the "**Boathouse Building**") . . . [as] more particularly depicted on the Development Plan attached hereto and incorporated herein as **Exhibit C** (hereinafter referred to as the "**Marina Landing Development Plan**").

Ex. 1 (Recitals); *see also* Ex. 1 § 6.15 (incorporating recitals).

10.     Prior to the City entering into the LDA, the Mayor and Council of the City of Salisbury passed Resolution 3137 approving the LDA and authorizing the City to enter into the LDA.  A copy of Resolution 3137 is attached hereto as **Exhibit 2** and incorporated herein by reference.  Notably, Section 4 of Resolution 3137 specifically incorporates the recitals of the LDA, including the foregoing recital specifically recognizing that the express purpose of the LDA was construction and development in accordance with the Marina Landing Development Plan.  Ex. 2.

11.     In furtherance of the express purpose of the LDA, Section 1.3 of the LDA provides that the "[t]he City shall cooperate with Developer in obtaining any and all approvals and/or permits necessary for Developer's development and construction of the project as more particularly shown on the Marina Landing Development Plan."  Ex. 1 § 1.3.  Section 1.6 of the

LDA further provides that the City shall reserve a City parking lot (the "**Parking Lot**") proximate to the Property to provide parking for the Marina Landing Project and requires the City to enter into a "Parking Lot Exclusive Use Agreement" (the "**Parking Lot Agreement**"). *See* Ex. 1 § 1.6. Moreover, Section 6.14 provides that "[e]ach party agrees that it will, without further consideration, execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other party to consummate more effectively the purposes or subject matter of this Agreement." Ex. 1 § 6.14.

12. The LDA also specifically provides that its provisions survive closing on the purchase of the Property and shall not merge into the deed (Ex. 1 § 3.10) and contemplates assignment of the rights under the LDA to a related party (Developer) prior to closing on the purchase of the Property (Ex. 1 § 3.12).

13. Following execution of the LDA, Developer's affiliate commenced the permitting process for the Marina Landing Project and worked towards closing on the property by, *inter alia*, finalizing the subdivision plat, finalizing permits, and securing building inspector approvals for the Project. On June 30, 2022, the City building inspector informed Developer's affiliate that the building permit was ready to be issued once engineering is approved.

14. In June 2023, Developer and the City closed on the purchase of the Property pursuant to the LDA and entered into the Parking Lot Agreement. Almost immediately the City approved a site grading permit and approved site plans for the Project.

15. Developer thereafter performed demolition work and grading work at the Property and continued the permits process.

**ELECTION OF NEW MAYOR**

16. In November 2023, Mayor Taylor won the Salisbury mayoral race by a margin of fifty votes after receiving 36.2 percent of total votes.

17. Thereafter, Mayor Taylor began a pattern of attempting to renegotiate City contracts and interfering with local development.

18. Indeed, since taking office, the City Council has at least once been forced to pass a resolution authorizing the Council Vice President to execute closing documents as required by preexisting City contracts after Mayor Taylor refused to do so.  The City Council was also recently forced to override Mayor Taylor's veto of a resolution increasing housing density.

**FRUSTRATION OF CONTRACT AND CONSTITUTIONAL DEPRIVATION**

19. In late 2024 and early 2025, Mayor Taylor turned his attention to the Marina Landing Project and instructed City employees to not cooperate with the Marina Landing Project, so he could renegotiate the LDA and extract further concessions from Developer.

20. As a result, even though City officials had already approved all requirements for the building permit for the Marina Landing Project, City officials refused to disclose to Developer the amount of the Building Permit fee (which is calculated on a project-specific basis).  Except for paying the undisclosed Building Permit fee, Developer had completed all steps to obtain a Building Permit.

21. City officials also refused Developer's pro forma request for an extension of its Site and Grading permit, which was requested by Developer's lender.

22. Developer subsequently confronted Mayor Taylor concerning the City's refusal to cooperate with these basic requests and specifically asked Mayor Tayor "are you holding my Project?"  Mayor Taylor unabashedly answered "yes."

23. Thereafter, on February 14, 2025, Developer's counsel sent formal notice of the City's breach of the LDA. A copy of Developer's Letter is attached hereto as **Exhibit 3** and incorporated herein by reference. Despite receiving Developer's formal notice, Mayor Taylor did not cure the breaches.

24. On February 24, 2025, Mayor Taylor responded with a letter (1) stating that the City's parking obligations in Section 1.16 of the LDA are in conflict with a prior reservation of the parking lot to Frank Hanna, Sr.'s restaurant and (2) seeking to "downsize" the already approved Marina Landing Development Plan to reduce the Project's likely parking needs. A copy of Mayor Taylor's February Letter is attached hereto as **Exhibit 4** and incorporated herein by reference.

25. Developer and Mayor Taylor subsequently met and attempted to negotiate a resolution. At stated in Mayor Taylor's April 4, 2025 letter, however, the "rolodex of options [Developer] provided . . . are not on the table." A copy of Mayor Taylor's April Letter is attached hereto as **Exhibit 5** and incorporated herein by reference. Instead, Mayor Taylor insisted that Developer "delete the boat house and reduce the demand for parking and allow additional site space for parking." *Id.* Moreover, Mayor Taylor stated that the supposed conflict between the City's parking obligations in Section 1.6 of the LDA and the City's prior reservation of the parking lot to Frank Hanna, Sr.'s restaurant were not "the [C]ity's burden [to] cure." *Id.*

**P<span/>ARKING L<span/>OT R<span/>ESERVATION H<span/>ISTORY**

26. In 1999, Frank Hanna, Sr. purchased the real property known as 502 W Main St, Salisbury, MD 21801 from the City pursuant to Resolution 657, which authorized a disposition contract that granted certain rights concerning the Parking Lot. A copy of the deed, disposition contract, and Resolution 657, which Frank Hanna, Sr. recorded in the land records of Wicomico

County, is attached hereto as **Exhibit 6** and incorporated herein by reference. In pertinent part, the disposition contract provides as follows concerning the Parking Lot:

> The City shall provide a parking area immediately adjacent to the parcel shewn on Exhibit "A" which is to be conveyed to Hanna. This area shall accommodate not less than 114 vehicles. There shall be no charge to Hanna for this parking for at least eight (8) years after the restaurant opens. Thereafter, the City may charge not more than its customary rates for downtown parking. Also, if in the future fee parking is instituted by the City, the City will endeavor to provide a manned parking attendant and use a "pay as you leave" arrangement. This parking obligation shall run as a servitude with the land retained by the City. These parking provisions shall be established by a recorded easement agreement or a recorded plat notation as acceptable to the attorneys for both Hanna and the City.

Ex. 6 at 8. On information and belief, the foregoing parking provisions were never established by a recorded easement agreement or a recorded plat notation.

27.    Until identified by Mayor Taylor in his February 2025 Letter, Developer was unaware (lacked actual knowledge) that a recorded land disposition agreement imposed the foregoing parking obligations. Developer instead relied upon the City's agreement in Section 1.6 of the LDA, which, for ease of comparison, provides as follows:

> **<u>Perpetual Parking Dedication</u>**. The City hereby expressly acknowledges and agrees to reserve the parking lot located on the City Lot (the "**LOT 1AA Parking Lot**") which consists of approximately One Hundred Fourteen (114) public parking spaces more or less, shall be used exclusively for public parking and/or parking for the Marina Landing Project to be developed by Developer hereunder. At Closing, the Parties shall enter into a separate, written agreement, to be titled "LOT I AA Parking Lot Exclusive Use Agreement" (the "**Parking Lot Agreement**"), containing such terms and conditions the Parties deem acceptable for purposes of setting forth the City's acknowledgement and agreement to reserve the LOT I AA Parking Lot. and all parking spaces thereof, **for the exclusive uses of (i) public parking and (ii) parking for the Marina Landing Project**, as expressly intended by the Parties under this Section 1.6. Notwithstanding any term to the contrary set forth herein, the Parties expressly acknowledge and agree Closing on the City's conveyance of the Sby Dev. Lot to Developer and Developer's development of the Marina

Landing Project as contemplated by this Agreement shall be expressly conditioned upon the Parties' execution of the Parking Lot Agreement Closing.

Ex. 1 § 1.6 (emphasis added).

## COUNT I
## 42 U.S.C. § 1983
## (MAYOR TAYLOR)

28. Developer re-alleges and incorporates by reference each allegation averred in the preceding paragraphs.

29. As owner of the Property and the "Developer" under the LDA who has expended substantial funds and time in connection with permitting, construction, and development at the Property, Developer has a property interest in the Marina Landing Project as set forth in in the Marina Landing Development Plan.

30. Indeed, Resolution 3137 and the corresponding LDA effectively granted Developer a protected status with respect to the Marina Landing Project as set forth in the Marina Landing Development Plan.

31. Mayor Taylor, acting in his official capacity as mayor, policymaker, and executive of the City of Salisbury, unlawfully deprived Developer of its already approved, authorized, vested property interest in the Marina Landing Project, without procedural or substantive due process and without just compensation, in violation of the Fourteenth and Fifth Amendments to the United States Constitution, by frustrating further construction and development.

32. Specifically, contrary to both the express cooperation obligation and express purpose of the LDA, Mayor Taylor arbitrarily instructed city officials not to perform the ministerial, non-discretionary act of telling Developer the amount of building permit fees it needed to pay to obtain its otherwise approved building permit. To be clear, the substantive review of the

building permit had been completed.  Calculating and relaying the amount of building permit fee is not discretionary.

33. Also contrary to both the express cooperation obligation and express purpose of the LDA, Mayor Taylor instructed city officials to refuse Developer's request for a perfunctory extension of a grading permit, which became necessary as a result of Mayor Taylor's actions in holding up the building permit.

34. In response to specific inquiries as to whether Mayor Taylor was "holding up" the Marina Landing Project, Mayor Taylor unabashedly affirmed "yes."

35. Mayor Taylor has sought substantial reductions in the size and scope to the Project to arbitrarily reduce the parking requirements.  Mayor Taylor's efforts are effectively a repudiation of the parking solution expressly outlined in the LDA whereby the City reserved the City Parking Lot for the Marina Landing Project.

36. Mayor Taylor's arbitrary and capricious parking preferences are not rooted in any local ordinance or the zoning code.  Indeed, in his February letter, Mayor Taylor admits that the Parking Lot would be sufficient to satisfy the parking requirements for the Marina Landing Project.  His concern instead is that despite the express authorization and approval of the former mayor and City Council of Salisbury in Resolution 3137 to grant use of the Parking Lot to the Marina Landing Project, in Mayor Taylor's estimation, there would be inadequate remaining parking for Frank Hanna Sr.'s restaurant and the public.

37. At all times relevant hereto, Mayor Taylor was acting under color of state law as the mayor of the City and as a policymaker setting the policy of the City that caused the deprivation of Developer's constitutionally protected property rights.

38. As a proximate result of the Mayor Taylor's unlawful conduct and deprivation of Developer's constitutionally protected rights, Developer has suffered harm, damages, and loss, without just compensation, for which it is entitled to monetary relief pursuant to 42 U.S.C. § 1983.

**WHEREFORE,** Developer respectfully requests judgment in its favor against Mayor Taylor for damages and just compensation in excess of **$40 million**, and for costs, expenses, pre- and post-judgment interest, and any further relief this Court deems just and proper.

### COUNT II
#### BREACH OF CONTRACT
#### (CITY OF SALISBURY)

39. Developer re-alleges and incorporates by reference each allegation averred in the preceding paragraphs.

40. The City and Developer's affiliate entered into the LDA whereby the City agreed to sell the Property to Developer for the purpose of constructing and developing the Marina Landing Towers and Boathouse Building as set forth in in the Marina Landing Development Plan. Ex. 1 (Recitals); *see also* Ex. 1 § 6.15 (incorporating recitals).

41. In furtherance of the express purpose of the LDA, Section 1.3 of the LDA provides that the "[t]he City shall cooperate with Developer in obtaining any and all approvals and/or permits necessary for Developer's development and construction of the project as more particularly shown on the Marina Landing Development Plan." Ex. 1 § 1.3.

42. Section 1.6 of the LDA further provides that the City shall reserve the City Parking Lot to provide parking for the Marina Landing Project and requires the City to enter into the Parking Lot Agreement. *See* Ex. 1 § 1.6.

43. Section 6.14 provides that "[e]ach party agrees that it will, without further consideration, execute and deliver such other documents and take such other action, whether prior

or subsequent to Closing, as may be reasonably requested by the other party to consummate more effectively the purposes or subject matter of this Agreement." Ex. 1 § 6.14.

44.     Developer thereafter purchased the Property pursuant to the LDA and expended substantial time and funds on permitting, construction, and development in accordance with the Marina Landing Development Plan.

45.     In late 2024 and early 2025, contrary to both the express cooperation obligation and express purpose of the LDA, Mayor Taylor, acting in his official capacity on behalf of the City, arbitrarily instructed city officials not to perform the ministerial, non-discretionary act of telling Developer the amount of building permit fees it needed it pay to obtain its otherwise approved building permit. To be clear, the substantive review of the building permit had been completed. Calculating and relaying the amount of building permit fee is not discretionary.

46.     Also contrary to both the express cooperation obligation and express purpose of the LDA, Mayor Taylor, acting in his official capacity on behalf of the City, instructed city officials to refuse Developer's request for a perfunctory extension of a grading permit, which became necessary as a result of Mayor Taylor's actions in holding up the building permit.

47.     In response to specific inquiries as to whether Mayor Taylor was "holding up" the Marina Landing Project, Mayor Taylor unabashedly affirmed "yes." Mayor Taylor's official actions and intent are to frustrate the purpose of the LDA.

48.     Mayor Taylor, acting in his official capacity on behalf of the City, has sought substantial reductions in the size and scope to the Project to arbitrarily reduce the parking requirements. Mayor Taylor's efforts are effectively a repudiation of the parking solution expressly outlined in the LDA whereby the City reserved the City Parking Lot for the Marina Landing Project. Indeed, in his February letter, Mayor Taylor, acting in his official capacity on

behalf of the City, admits that the Parking Lot would be sufficient to satisfy the parking requirements for the Marina Landing Project. His concern instead is that in his estimation, there would be inadequate remaining parking for Frank Hanna Sr.'s restaurant and the public.

49. As a proximate result of the City's breaches of the LDA, Developer has suffered harm, damages, and loss, for which it is entitled to monetary relief.

**WHEREFORE,** Developer respectfully requests judgment in its favor against the City for damages in excess of **$40 million**, and for costs, expenses, attorney's fees, pre- and post-judgment interest, and any further relief this Court deems just and proper.

Respectfully submitted,

*/s/     Nathan D. Adler*
Nathan D. Adler (Bar No. 22645)
Robert C. Baker III (Bar No. 20382)
**NEUBERGER QUINN GIELEN RUBIN & GIBBER, P.A.**
One South Street, 27th Floor
Baltimore, Maryland 21202
Telephone:    (410) 332-8516
Facsimile:    (410) 332-8517
nda@nqgrg.com | rcb@nqgrg.com